IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

OSCAR EDGARDO VELASQUEZ,        )
                                )
        Petitioner,             )
                                )
            v.                  )      1:14cv1688 (JCC/MSN)
                                )
MARIA TERESA FUNES DE           )
VELASQUEZ,                      )
                                )
        Respondent.             )

**M E M O R A N D U M   O P I N I O N**

On December 11, 2014, Oscar Edgardo Velasquez, an El Salvadorian citizen ("Oscar" or "Petitioner"), filed suit in this Court against his now-estranged wife Maria Teresa Funes de Velasquez, also an El Salvadorian citizen ("Maria" or "Respondent"), under the International Child Abduction Remedies Act, 22 U.S.C. § 9001 et seq. ("the Act"), seeking the return of his two minor daughters.  The Act implements the Hague Convention on the Civil Aspects of International Child Abduction, T.I.A.S. No. 11,670, 19. I.L.M. 1501, 1988 WL 411501 (Oct. 25, 1980) (the "Hague Convention"),[1] and enables a person whose child has been removed to, or retained in, the United States in violation of the Hague Convention to file suit against the wrongdoer for return of the child.  22 U.S.C. § 9003(b).

---

[1] Both the United States and El Salvador are signatories to the Hague Convention.

1

To summarize Oscar's claims in the Petition, he alleges that he traveled with Maria and their two minor daughters from El Salvador to the United States for vacation in November of 2013.  After visiting family in Maryland and Virginia for a couple of months, Oscar returned, by himself, to El Salvador for a brief period of time.  Oscar returned to the United States on February 20, 2014 and claims that since February 27, 2014, Maria has wrongfully retained their two minor daughters, ages five and seven, in the United States and refuses to return them to El Salvador.

This matter is now before the Court after a two-day non-jury trial on the merits of Oscar's Verified Complaint and Petition for Return of the Children [Dkt. 1] ("Pet."). After receiving evidence and hearing argument of counsel, the Court took the matter under advisement.  Pursuant to Rule 52 of the Federal Rules of Civil Procedure, the Court now issues its findings of fact and conclusions of law.  For the following reasons, the Court will deny and dismiss Oscar's Petition.

## I. Background

On December 15, 2014, after conducting an ex parte hearing four days after Oscar filed the Petition, the Court granted his request for a temporary restraining order ("TRO"). (TRO [Dkt. 7] at 1-2.)  The TRO restrained Maria from removing the daughters from the Eastern District of Virginia and directed

her to show cause at a preliminary injunction hearing why the daughters should not be returned to El Salvador. (Id. at 2.) The Court denied Oscar's request for a warrant for physical custody of the daughters. (Id.)

On January 7, 2015, the Court held the preliminary injunction hearing, where both parties were represented by counsel and the Court received preliminary evidence to determine whether the TRO should remain in effect until final disposition. The Court granted in part Oscar's request for a preliminary injunction, which restrained Maria from removing the children from the territorial confines of Washington, D.C., Maryland, Virginia, and North Carolina until final disposition. (Prelim. Inj. [Dkt. 20] at 1.) Pursuant to the Hague Convention, the Court expedited the scheduling of this matter for trial. See Hague Convention, art. 11 ("The judicial or administrative authorities of Contracting States shall act expeditiously in proceedings for return of the children."). At trial, the Court received documentary evidence and heard testimony from seven witnesses, including Oscar and Maria.

## II. Legal Standard

"The Hague Convention seeks to protect children[2]

---

[2] The Hague Convention applies to any child under the age of sixteen years who was habitually residing in a Contracting State immediately before the breach of custody or access rights. Hague Convention, art. 4, 19 I.L.M. at 1501.

internationally from the harmful effects of their wrongful
removal or retention and to establish procedures to ensure their
prompt return to the State of their habitual residence, as well
as secure protection for rights of access." Maxwell v. Maxwell,
588 F.3d 245, 250 (4th Cir. 2009) (quoting Hague Convention,
pmbl., 19 I.L.M. at 1501) (internal quotations omitted).  Courts
effectuate this intent by "preserv[ing] the status quo[.]"
Miller v. Miller, 240 F.3d 392, 398 (4th Cir. 2001).

### A. The Prima Facie Case of Wrongful Retention

Under the Act and the Hague Convention, a petitioner
has the burden of proof and must establish by a preponderance of
the evidence that his children were "wrongfully removed or
retained within the meaning of the Convention."  22 U.S.C. §
9003(e)(1)(A).  The prima facie case of wrongful retention, as
it pertains to the facts of this case, includes the following
necessary elements:  (1) the daughters were "habitually
resident" in El Salvador at the time of retention in the United
States; (2) the retention was in breach of the Petitioner's
custody rights under El Salvadorian law; and (3) the Petitioner
had been exercising his custodial rights at the time of
retention.  See, e.g., Miller, 240 F.3d at 398 (citing Hague
Convention, art. 3, 19 I.L.M. at 1501).

Under the first element of the prima facie case, it
must be shown by a preponderance of the evidence that the

daughters were "habitually resident" in El Salvador at the time of their retention in the United States.  Id.  As the Fourth Circuit has repeatedly noted, "[t]he framers of the Hague Convention intentionally left 'habitual residence' undefined, and intended that term to be defined by the unique facts in each case."  Maxwell, 588 F.3d at 251 (citing Whiting v. Krassner, 391 F.3d 540, 546 (3d Cir. 2004)).  Given that the "habitual residence" factual determination is the first step in establishing a prima facie case of wrongful retention, at least one appellate court has noted that this determination "is the central[,] often outcome-determinative-concept on which the entire system is founded."  Mozes v. Mozes, 239 F.3d 1067, 1072 (9th Cir. 2001).

      "A person can have only one habitual residence.  On its face, habitual residence pertains to customary residence prior to removal [or retention].  The court must look back in time, not forward."  Miller, 240 F.3d at 400 (quoting Friedrich v. Friedrich, 983 F.2d 1396, 1401 (6th Cir. 1993) ("Friedrich I")).  It can be difficult to ascertain "habitual residence" from the perspective of the minor children.  This difficulty is enhanced "when the persons entitled to fix the child's residence no longer agree on where it has been fixed--a situation that, for obvious reasons, is likely to arise in cases under the [Hague] Convention."  Maxwell, 588 F.3d at 251 (quoting Mozes,

239 F.3d at 1076).  To assist district courts with this question of fact, the Fourth Circuit joined the Second and Eleventh Circuits by adopting a two-part framework from the Ninth Circuit.  Maxwell, 588 F.3d at 251 (citing Mozes, 239 F.3d at 1075; Ruiz v. Tenorio, 392 F.3d 1247, 1252 (11th Cir. 2004) (adopting the two-part test from Mozes); Gitter v. Gitter, 396 F.3d 124, 132 (2d Cir. 2005) (adopting the Mozes test)).

Under this test, known as the Mozes test, "the first question is whether the parents shared a settled intention to abandon the former country of residence."  Maxwell, 588 F.3d at 251 (citing Mozes, 239 F.3d at 1075) (additional citations omitted).  When there is a deep divide between the parties regarding a child's habitual residence, as is the case here, "the representations of the parties cannot be accepted at face value, and courts must determine habitual residence from all available evidence."  Id. (quoting Gitter, 396 F.3d at 135) (additional citation and internal alterations omitted).  By first focusing on parental intent, the Court is able to give "contour to the objective, factual circumstances surrounding the child's presence in a given location.  This allows an observer to determine whether the child's presence at a given location is intended to be temporary rather than permanent."  Gitter, 396 F.3d at 132.  To determine parental intent, courts have considered the following factors: "parental employment in the

new country of residence; the purchase of a home in the new country and the sale of a home in the former country; marital stability; the retention of close ties to the former country; the storage and shipment of family possessions; the citizenship status of the parents and children; and the stability of the home environment in the new country of residence." Maxwell, 588 F.3d at 252 (citations omitted).

The second question under the Mozes test is "whether there was an actual change in geography coupled with the passage of an appreciable period of time, one sufficient for acclimatization by the children to the new environment." Id. at 251 (quoting Papakosmas v. Papakosmas, 483 F.3d 617, 622 (9th Cir. 2007) (quoting Mozes, 239 F.3d at 1078)) (internal quotation marks omitted).

> The question here is not simply whether the child's life in the new country shows some minimal degree of settled purpose, but whether the child's relative attachments to the countries have changed to the point where ordering the child's return would now be tantamount to taking the child out of the family and social environment in which its life has developed.

Maxwell, 588 F.3d at 253-54 (quoting Mozes, 239 F.3d at 1081) (internal quotation marks and alterations omitted). To make this determination, courts have considered the following factors: "school enrollment, participation in social activities, the length of stay in the relative countries, and the child's

7

age to determine the extent of a child's acclimatization to the new country of residence." Id. at 254 (citations omitted).

       After determining the children's "habitual residence" at the time of retention, under the second element of the prima facie case, the Court must next determine whether the retention was in breach of the Petitioner's custody rights under El Salvadorian law. Miller, 240 F.3d at 398 (citing Hague Convention, art. 3, 19 I.L.M. at 1501). To make this finding, the Court examines the parties' custodial rights at the time of retention. White v. White, 718 F.3d 300, 308 (4th Cir. 2013). Lastly, under the third element of the prima facie case, the Court must determine whether the Petitioner had been exercising his custodial rights at the time of retention. Miller, 240 F.3d at 398 (citing Hague Convention, art. 3, 19 I.L.M. at 1501). The Court relies on the law of the place of habitual residence to make this determination. Id. at 401 (citing Friedrich I, 983 F.3d at 1402 ("Under the Convention, whether a parent was exercising lawful custody rights over a child at the time of removal must be determined under the law of the child's habitual residence.")) (additional citation omitted). If the Petitioner satisfies his burden of proof by establishing a prima facie case of wrongful retention, the Court turns next to any affirmative defenses advanced by the Respondent.

## B. Affirmative Defenses to Wrongful Retention

If the Petitioner establishes a prima facie case by a
preponderance of the evidence, thus proving the retention was
wrongful, the children must be returned to El Salvador, unless
the Respondent can establish one of four available defenses.
Miller, 240 F.3d at 398 (citing 22 U.S.C. § 9003(e)(2)(A)
(requiring proof, by clear and convincing evidence, that one of
the exceptions set forth in article 13b or 20 of the Hague
Convention applies); 22 U.S.C. § 9003(e)(2)(B) (requiring proof,
by a preponderance of the evidence, that some other exception
set forth in article 12 or 13 of the Hague Convention applies)).
As noted, the defenses must be proven under varying burdens.

Specifically, the Respondent could show, by clear and
convincing evidence, that: (1) there was a grave risk that the
children's return to the Petitioner would expose them to
physical or psychological harm or otherwise place them in an
intolerable situation, see Hague Convention, art. 13b, 19 I.L.M.
at 1502, or (2) the return of the children to El Salvador would
not be permitted by the fundamental principles of the United
States "relating to the protection of human rights and
fundamental freedoms," see id., art. 20, 19 I.L.M. at 1503.
Miller, 240 F.3d at 398.  The Respondent could also set forth an
affirmative defense to wrongful retention if she establishes by
a preponderance of the evidence that: (1) this action was not

9

commenced within one year of the retention and the children are now well-settled in Virginia, <u>see</u> Hague Convention, art. 12, 19 I.L.M. at 1502, or (2) the Petitioner "was not actually exercising the custody rights at the time of [retention] . . . or had consented to or subsequently acquiesced in the [retention]," <u>see</u> <u>id.</u>, art. 13a, T.I.A.S. No. 11,670, at 4, 19 I.L.M. at 1502.  <u>Miller</u>, 240 F.3d at 398-99.

With these standards in mind, the Court turns to its findings of fact and conclusions of law.

### III. Findings of Fact

The Court has jurisdiction over this matter pursuant to 22 U.S.C. § 9003(a), formerly codified as 42 U.S.C. § 11603(a), and 28 U.S.C. § 1331.  Venue is proper pursuant to 22 U.S.C. § 9003(b), formerly cited as 42 U.S.C. § 11603(b), and 28 U.S.C. § 1391(b).  Under Rule 52(a)(1) of the Federal Rules of Civil Procedure, after trying an action without a jury, "the court must find the facts specially and state its conclusions of law separately."  The Court carefully reviewed the entire record of this case, including the evidence received at trial.  By presiding over the trial, the Court assessed the credibility of witnesses and weighed their testimony.  While there are some facts upon which the parties agree, there are also sharply contested factual disputes that the Court must resolve, and thus, the Court issues the following findings in that regard.

In general, the Court credits the testimony of Maria and her corroborating witnesses, and therefore gives more weight to her version of the events in this case.  As Petitioner, Oscar has the burden of proof, discussed above.  The Court finds that Oscar has failed to carry his burden, and that his version of the events should not be wholly credited.  Specifically, the Court finds that Oscar's credibility was diminished based on his demeanor during his testimony, and his inability to remember or his flat refusal to recall certain factual details of the events in this case.  The Court will note these credibility findings as it chronologically discusses the facts of this case.

On March 3, 2006, Oscar and Maria were married in El Salvador.  (Resp't Ex. 1.)  At the time, Oscar was fifty-six years old and Maria was seventeen years old.  (Id.; Trial Tr. at 85-86.)  Maria gave birth to their eldest daughter, M.D.F., approximately one year later on March 21, 2007 in San Salvador, El Salvador.  (Pet'r Ex. 1-B.)  Subsequently, Maria gave birth to their youngest daughter, M.A.F., on March 6, 2009 in San Salvador, El Salvador.  (Pet'r Ex. 1-C.)  At the time Oscar filed the Petition, the daughters were seven years old and five years old, respectively.  Oscar previously served as a colonel in the El Salvadorian military, but since his retirement in 2000 he has not worked. He has invested in property, including property in the United States.  (Trial Tr. at 79.)  Maria

attended school through the ninth grade.  (Id. at 86.)  Prior to November of 2013, Oscar and Maria lived with the daughters in their family residence in Santa Elena, El Salvador.  (Pet'r's Ex. 1-D.)  The daughters were enrolled in the "Profesor Lisandro Arevalo" Educational Complex in Santa Elena, El Salvador; as of April of 2014, the eldest daughter was enrolled in second grade, while the youngest daughter was enrolled in kindergarten. (Pet'r's Ex. 1-E.)

The United States Department of State has identified El Salvador as one of the most violent countries in the world. (Resp't Ex. 12 at 1 ("There are no areas within the city of San Salvador (or the country of El Salvador) that are deemed free of violent crime.").)  Crime in El Salvador is unpredictable, gang-centric, and directed against both known victims and targets of opportunity.  (Id.)  Extortion is "a very common and effective criminal enterprise" in El Salvador.  (Id. at 3.)  "Recent progress in the reductions of homicides has not been accompanied by a significant reduction in the extortion that often leads to other violent crimes."  (Id.)  To combat the high incidence of extortion, in 2006, the police department formed an Anti-Extortion Task Force.  (Id.)

On February 25, 2011, Oscar and Maria received a telephone call at the family residence.  (Resp't Ex. 2.)  The caller attempted to extort money from Oscar by threatening to

kidnap or otherwise harm Maria and their daughters.  (Id.)

Later that day, Oscar reported this extortion and threat of

violence to the Anti-Extortion Task Force of the National Civil

Police Department.  (Id.)  Under penalty of perjury, Oscar filed

the following complaint:

> The 25th of February [Oscar] was at home, in
> the room and at about thirteen hours
> received a phone call . . . the lady
> cleaning the house answered the call and
> heard a male voice demanding to get the
> Colonel.  She gave the phone to [Oscar,] the
> victim, [who] heard a male voice saying he
> wanted to negotiate, [and that] he knows his
> wife and two daughters; [the male voice]
> even mention[ed] the name of the victim's
> wife.  The victim said that he would not be
> intim[id]ated by him and was about to say
> something when the subject emphasized that
> he knows his family and he is a man of
> respect; then the victim asked what did he
> want from him; the victim said he didn't
> have nothing [sic] to negotiate and hung up
> the phone.  The victim asks of the
> prosecutor and police involved in this case
> and having nothing else to do or mention in
> this record and more consistently signed
> [sic].[3]

(Resp't Ex. 2.)  Three days after the filing of this report,[4] on

---

[3] This is a direct quote from the translated version of the
police report, originally written in Spanish, Oscar's native
language.
[4] Extortion and threats of bodily harm were not new to Oscar or
his family members.  Approximately twenty years ago, another
daughter from Oscar's first marriage was abducted and held for
ransom.  (Trial Tr. at 56-57, 65.)  After being held captive for
multiple days, Oscar's daughter was rescued by armed members of
the El Salvadorian military after Oscar paid the kidnappers
approximately $30,000.  (Id.)  Thus, the Court does not credit
Oscar's testimony that he believed the threatening phone call,

February 28, 2011, the police and the Attorney General of El
Salvador granted "victim status" to Oscar and his family under
the Special Law for the Protection of Victims and Witnesses.
(Resp't Ex. 3.)  Under this statutory protection, only
investigators, prosecutors, and judges would have access to the
family members' personal information.  (Id.)  In all
administrative and judicial records, because he was a victim of
extortion, Oscar would be known by the password "MILTON."[5]  (Id.)

        After the daughters were born, the family traveled to
the United States once per year, typically between November and
February.  (Trial Tr. at 27, 89-90.)  In the fall of 2011, the
family traveled to Kentucky to visit Oscar's brother and Maria's
family.  (Id. at 38-40.)  Maria testified that they inquired
about political asylum during this stay in the United States,
due to the violence in El Salvador, and specifically, the
threatening telephone call.  (Id. at 90.)  During this vacation,
they enrolled the eldest daughter in pre-school or early
education classes for the duration of their stay.  (Id. at 38-
40.)

---

and the later in-person visit discussed below, were merely
jokes.  Clearly, Oscar's wealth and status in the community made
his wife and daughters a target for extortion, which runs
rampant in El Salvador.
[5] During his testimony, Oscar refused to acknowledge that he had
been granted "victim status."  (See Trial Tr. at 35-36, 38, 64.)

On November 19, 2013,[6] the family again traveled to the United States by flying from San Salvador to Los Angeles, California, with a layover in Dallas, Texas.  (Pet'r Ex. 2.) The roundtrip tickets included a return flight from Los Angeles through Dallas to San Salvador on January 25, 2014.  (Id.) Oscar owns five properties around Oakland, California that he bought during the recession as an investment opportunity. (Trial Tr. at 49, 55, 79.)  The family stayed with Oscar's sister, Ms. Calderon.  (Id. at 50.)  The Court is unable to make any findings as to what the family did in California, or how long they stayed.  Oscar flatly refused to answer questions on this topic, often citing an inability to remember, but testified that he did not visit any of his properties during this trip. (Id. at 50-51.)  He did testify that they would take the daughters to walk in a nearby park.  (Id. at 51.)  Maria testified that they stayed in California for approximately one month and that she assisted Oscar's sister in cleaning houses during this time.  (Id. at 93.)

The family did not use the return-trip tickets to El Salvador from Los Angeles.  Instead, the family traveled from California to Maryland to stay with Maria's sister, Rina Funes,

---

[6] The parties dispute whether the family traveled on the 18th or 19th of November.  (See Trial Tr. at 46-49.)  However, Petitioner's Exhibit 2, a photo copy of the flight itinerary from American Airlines, clearly shows a departure date of November 19, 2013.  (Pet'r Ex. 2.)

and to meet a newborn little girl.  (Trial Tr. at 51-52.)  The
exact date and nature of the family's departure from California
and their arrival in Maryland remains unknown, although Maria
testified that the family traveled to Maryland in December of
2013.  (Id. at 93.)  The family stayed in Maryland for
approximately one month.  (Id.)

On or around December 26, 2013, back in El Salvador,
Maria's sister received a threat from a gang of three people who
came to her house while she was preparing to feed the cows.
(Resp't Ex. 5.)  The gang specifically threatened to kill Maria
if she ever returned to El Salvador from the United States.
(Id. at 2.)  Maria's sister reported this threat to the police,
and gave the following statement under penalty of perjury:

> On the day of December 26, 2013, at about 17
> hours and 40 minutes, at a time when
> [Maria's sister] was preparing to feed the
> cows; came to her house three people,
> including a woman, who wore black rags
> covering their face and the men, one wearing
> blue pants and black shirt with a drawing of
> a white cross in front.  The other was
> dressed in black pants and black shirt; and
> the woman wore pale/faded blue color shorts
> and a black blouse; and black sneakers.
> When the complainant [Maria's sister] saw
> them, asked/wondered what they were looking
> for; and it was then, that the woman who was
> with the two men jumped over to the
> complainant and grabbed her; and told the
> complainant to shut up or we'll kill you.
> Then one of the men told the woman, who was
> with them, to bring the complainant inside
> the house so no one sees us.  Then the
> complainant asked them what they wanted,

> then one of the men approached the
> complainant with a machete in his hand, he
> placed the machete on the complainant's neck
> and asked, where is your sister Maria Funez,
> answered that her sister was not here, she
> was traveling in the United States; [she]
> clarifies, when they asked for her sister,
> they refer by her sister's name: Ms. Maria
> Teresa Funez of Velasquez, who really is her
> sister.  At that time, the woman who was
> with the subjects said: "Oh what a pity!"
> and let go of the complainant; then, one of
> the subjects never pulled his hand from
> under his shirt; and according to the
> complainant, he carried a firearm; the man
> told the complainant: "Look Lucia, tell your
> sister, Maria that she should never return
> to this Canton (this town) because if not,
> we are going to kill you both, you and your
> sister"; to what Ms. Lucia Funez tearfully
> replied, we do not do any harm to no one.
> Subjects then told the complainant not to
> leave the house and subjects left the place.

(Resp't Ex. 5 at 1-2.)  Maria's mother contacted Oscar in the

United States to tell him about this latest threat.  (Trial Tr.

at 65.)

It is undisputed that on January 26, 2014, Oscar

returned to El Salvador alone, without Maria and the daughters.

(Trial. Tr. at 65, 209-211; Pet'r Ex. 1-H at 64.)  At the same

time, Maria and the daughters briefly stayed with her brother,

Oscar Funes, in North Carolina.  (Id.)  After a couple weeks in

North Carolina, Oscar's nephew Llefren Velasquez picked up Maria

and the daughters and drove them back to Manassas, Virginia.

(Id. at 96-97.)  Oscar's purpose for traveling back to El

Salvador, however, is greatly disputed.  Thus, the Court makes

the following findings.

The parties agree that one purpose for Oscar's solo trip to El Salvador was to investigate the latest threat made against Maria's life. (Trial Tr. at 65, 98-99.) But Oscar also traveled to El Salvador to retrieve money so that he could purchase a house in the United States upon his return. (Id. at 210-211.) This finding is corroborated by the testimony of Maria, Oscar's nephew Llefren Velasquez, Llefren's wife Jenny Rivera, and even portions of Oscar's own testimony. Specifically, between December of 2013 and February of 2014, when visiting relatives on the East Coast, Oscar's statements and conduct reflect his intent to purchase a home and settle his family in the United States.

Most notably, Oscar talked to Maria about selling the home in El Salvador and buying a home in North Carolina. (Trial Tr. at 96.) Oscar also talked to Maria about immigrating to the United States with assistance from an older daughter from his first marriage, who lives in the western part of the United States. (Id. at 99.) Oscar voiced these dual intentions of buying a house and immigrating to the United States to others, who testified at trial.

First, Oscar Funes, Maria's brother, testified that in January of 2014, Oscar said he was returning to El Salvador to get money and to make arrangements to buy a house in North

18

Carolina because Maria liked how peaceful it was there.  (Trial Tr. at 124-125.)

Second, Llefren Velasquez, Oscar's nephew, who first met Oscar around 1990 in El Salvador, testified that Oscar previously discussed his plans to immigrate to the United States during a car trip from Maryland to Kentucky.  (Trial Tr. at 150-151.)  Generally, Oscar also told his nephew that he wanted the daughters to stay in the United States because of the threats against the family in El Salvador.  (Id.)  Specifically, Llefren accompanied Oscar to meet with a real estate agent, who gave Oscar addresses of old houses for sale that needed to be remodeled, which Oscar viewed as an investment opportunity. (Id. at 151-152)  Llefren testified that Oscar previously stated he wanted to buy houses and fix them for his wife and "the girls."  (Id.)  Additionally, Llefren and his wife, Jenny Rivera, both accompanied Oscar to the office of immigration attorney Luis Gonzalez in Arlington, Virginia, where Oscar inquired about acquiring an "investor's visa" and that his older daughter from his first marriage was assisting him in acquiring green cards for the family.  (Id. at 153-155.)

Third, Jenny Rivera, Llefren's wife, corroborated much of the above testimony.  Jenny testified that Oscar lived in their house with Maria and the daughters in Manassas, Virginia for a period of time in January of 2014 before he went back to

19

El Salvador by himself.  (Trial Tr. at 179-180.)  During this
time, Jenny heard Oscar discussing plans to buy a house in North
Carolina and that he wanted to buy a house in Virginia so that
all of the family members could be united.  (Id. at 180-181.)
Jenny also corroborated Llefren's testimony about Oscar's
meeting with the immigration attorney, and that one of the
reasons Oscar returned to El Salvador was to get money and
return to the United States to buy a house here for his wife
Maria and the daughters.  (Id. at 181-182.)

Lastly, on cross-examination during his rebuttal
testimony after listening to the witness testimony described
above, Oscar himself admitted that one of the reasons he went
back to El Salvador in January of 2014 was to get money to buy a
house in the United States.  (Trial Tr. at 210-211.)  Oscar also
acknowledged meeting with an immigration attorney, where he
explored the possibility of green cards for himself, Maria, and
the daughters.  (Id. at 216-218.)

Ultimately, Oscar returned to the United States on
February 20, 2014, after he investigated the threat from
December.  (Trial Tr. at 60.)  Notably, Oscar entered the United
States without a return flight to El Salvador for himself,
Maria, or the daughters.  (Id. at 61.)  Oscar was reunited with
Maria and the daughters at Llefren and Jenny's townhouse in
Manassas, Virginia, where they had been staying since their

return from North Carolina; indeed, Oscar stayed there as well.
The very next day, on February 21, 2014, Oscar and Maria took
the daughters to get various immunizations for the purpose of
enrolling them in the Prince William, Virginia public schools.
(Resp't Ex. 10.)  Both Oscar and Maria visited the school that
the daughters would attend.  (Trial Tr. at 97.)

However, only four days later, on February 25, 2014,
Oscar booked a nonstop flight from Washington, D.C. to San
Salvador for himself, Maria, and the daughters, which was to
depart three days later, on February 28, 2014.  (Pet'r Ex. 1-F.)
There was no direct evidence in the record to suggest what
prompted Oscar to book this flight.  The evidence did show,
however, that at some point between February 21, when the
daughters were vaccinated, and February 25, when Oscar bought
tickets for the flight to El Salvador, Oscar discovered that
Maria was involved in a romantic relationship with another man,
Stanley Mejia.  (Trial Tr. at 71, 121.)  Subsequently, on
February 27, 2014, Maria told Oscar that she and the daughters
would not be returning to El Salvador and instead were staying
in Manassas, Virginia.  (Pet'r Ex. 1 at ¶ 14.)  The same day,
Maria called the police alleging that Oscar was attempting to
kidnap the daughters.  (Pet'r Ex. 1 at ¶ 15.)  The police
arrived and determined that no crime had been committed, but
recommended counseling for the daughters.  (Id.)  The next day,

Oscar returned to El Salvador alone.  (Id.)  Maria and the
daughters did not travel back to El Salvador with Oscar on
February 28, 2014, but instead, stayed in the United States.

Subsequently, in Prince William County, Virginia, the
oldest daughter enrolled in elementary school on March 6, 2014,
and the youngest daughter enrolled in pre-kindergarten
activities on September 2, 2014.  (Resp't Ex. 11.)  Their school
principal opined that both daughters had good attendance and
were responsible students, as of January 13, 2015.  (Resp't Ex.
11 at 1.)  The daughters socialize with friends and attend
birthday parties on the weekends.  (Trial Tr. at 100-101.)
Maria and the daughters attend church on Sundays.  (Id.)
Maria's sister lives in Maryland and she has uncles in the area.
(Id.)  Maria and the daughters still reside at Llefren and
Jenny's house in Manassas, Virginia with their three children
and Stanley Mejia.  (Id.)

In January or February of 2015, Maria met with an
immigration attorney to discuss and pursue asylum for her and
the daughters because she does not want to return to El Salvador
due to the threats and instability.  (Trial Tr. at 102.)  On
November 20, 2014, the Prince William County Juvenile and
Domestic Relations Court awarded temporary custody of the
daughters to Maria, but that proceeding was stayed pending the
outcome of this matter.  (Resp't Ex. 7.)  Maria recently filed

for divorce in Prince William County, and Oscar recently filed

for divorce in El Salvador.  (Trial Tr. at 63, 104, 120.)

## IV. Conclusions of Law

At the outset, the Court must note that, as is so

often the case with matters brought under the Hague Convention,

this is a difficult case.  In making the factual findings above

and the conclusions of law that follow below, the Court does not

question that Oscar and Maria both love their daughters and want

only the best possible life for them.  Nonetheless, under the

Hague Convention, this Court is tasked with determining (1)

whether Maria's retention of the daughters in the United States

was wrongful, and (2) if so, whether Maria successfully asserted

any affirmative defense.  For the following reasons, the Court

finds that Maria's retention of the daughters was not wrongful

because the daughters' habitual residence at the time of

retention was the United States, and therefore, Oscar's prima

facie case fails.  Alternatively, even if the Court found in

Oscar's favor on the first issue, the Court would also find that

returning the daughters to El Salvador poses a grave risk of

physical harm.  Accordingly, Oscar's petition will be denied and

dismissed.

### A. Prima Face Case of Wrongful Retention

Oscar bears the burden of proving by a preponderance

of the evidence that Maria's retention of the daughters in the

United States was wrongful.  22 U.S.C. § 9003(e)(1)(A).  To satisfy his burden, Oscar must show that (1) the daughter's habitual residence immediately prior to retention was El Salvador; (2) Maria's retention of the daughters breached his custodial rights under El Salvadorian law; and (3) he was exercising his custodial rights at the time of retention.  See Miller, 240 F.3d at 398.  The Court now turns to each element of the prima facie case.

### 1. Habitual Residence

The Court first addresses where the daughters' habitual residence was immediately prior to retention.  This element, as noted by other federal courts, is the "outcome-determinative concept on which the entire system is founded." Mozes, 239 F.3d at 1072.  The Court concludes that the daughters were habitually resident in the United States immediately prior to their retention under the two-part framework that has been adopted by the Fourth Circuit.  Maxwell, 588 F.3d at 251.

### a. Parental Intent

Because minor children like the daughters "normally lack the material and psychological wherewithal to decide where they will reside," the Court looks to the shared parental intent of Oscar and Maria as the "persons entitled to fix the place of the child[ren]'s residence."  Mozes, 239 F.3d at 1076 (citation omitted).  As the court in Mozes recognized, in cases such as

this where "the persons entitled to fix the child[ren]'s residence no longer agree on where it has been fixed . . . [the Court] must determine from all available evidence whether the parent petitioning for return of [the] child[ren] has already agreed to the child[ren]'s taking up habitual residence where it is." Id.  Based on the findings of fact above, the Court concludes that this is a case "where the petitioning parent had earlier consented to let the child stay abroad for some period of ambiguous duration . . . [and that] despite the lack of perfect consensus, the court finds the parents to have shared a settled mutual intent that the stay last indefinitely." Id. at 1077; see also Maxwell, 588 F.3d at 251.  This finding supports the ultimate conclusion of "a mutual abandonment of the child's prior habitual residence." Mozes, 239 F.3d at 1077.

Here, under the circumstances of this case and the objective factors set forth by the Fourth Circuit, the Court concludes that both Oscar and Maria intended to abandon El Salvador and settle in the United States immediately prior to February 27, 2014, the date of retention. See Maxwell, 588 F.3d at 252.

First, Oscar and Maria both had employment opportunities in the United States, the new country of residence. See Maxwell, 588 F.3d at 252 ("Federal courts have considered the following facts as evidence of parental intent:

25

parental employment in the new country of residence . . . .").
Oscar retired from the military fifteen years ago, but was
pursuing work as a real estate investor.  (Trial Tr. at 79.)  He
already owned five properties in California, and the evidence at
trial showed he was interested in acquiring new property in
North Carolina and Virginia.  (Id. at 55-56.)  He even attempted
to obtain an "investor's visa" by meeting with an immigration
attorney.  (Id. at 59.)  And Maria was previously not employed
in El Salvador, but has since gained employment in the United
States.  (Id. at 87, 103.)  Thus, the first objective factor
weighs in favor of Oscar and Maria's parental intent to
habitually reside in the United States.  Maxwell, 588 F.3d at
252.

        Second, even though Oscar had not yet purchased a home
in the United States at the time of retention, nor had he sold
his home in El Salvador, his actions, when viewed objectively,
show that he intended to do so.  See id. ("Federal courts have
considered the following factors as evidence of parental intent:
. . . the purchase of a home in the new country and the sale of
a home in the former country . . . .").  On January 26, 2014,
Oscar returned to El Salvador to get money to purchase a home in
the United States.  See supra, sec. III.  Previously, Oscar
discussed his intention to buy a home with other individuals.
Maria wanted Oscar to buy a home and live in the United States.

And Oscar met with at least one real estate agent to inquire about available properties in Virginia.  Subsequently, he viewed at least one property in Virginia and discussed his intent to buy a home that could unite the extended family in the area. Thus, the second objective factor also weighs in favor of Oscar and Maria's parental intent to habitually reside in the United States.  Maxwell, 588 F.3d at 252.

Third, immediately prior to February 27, 2014, the date of retention, Oscar and Maria's marriage was stable.  See id. ("Federal courts have considered the following factors as evidence of parental intent: . . . marital stability . . . ."). There is absolutely no evidence in the record of marital discord before February 25, 2014, when Oscar booked the return flight to El Salvador and first learned that Maria was involved in a romantic relationship with another man.  Thus, immediately prior to the date of retention, the Court finds the marriage was otherwise stable, which also favors the conclusion that the United States was the habitual residence.  Maxwell, 588 F.3d at 252.

Fourth, there is no evidence in the record regarding "the retention of close ties to the former country [El Salvador]," or "the storage and shipment of family possessions." See Maxwell, 588 F.3d at 252 ("Federal courts have considered the following factors as evidence of parental intent: . . . the

27

retention of close ties to the former country; the storage and shipment of family possessions . . . .").  Accordingly, these factors weigh neither in favor of El Salvador or the United States as the country of habitual residence.

Fifth, Oscar, Maria, and the daughters had no legal status in the United States immediately prior to February 27, 2014.  See id. ("Federal courts have considered the following factors as evidence of parental intent: . . . the citizenship status of the parents and children . . . .").  This weighs against the conclusion that the United States was the country of habitual residence.  However, this factor is mitigated by the evidence in the record that shows both Oscar and Maria sought counsel from an immigration attorney regarding their status in the United States, and that Maria has subsequently taken steps to obtain asylum for her and the daughters.

Lastly, the home environment in the United States was relatively stable immediately prior to the date of retention. See id. ("Federal courts have considered the following factors as evidence of parental intent: . . . the stability of the home environment in the new country.").  Oscar, Maria, and the daughters were staying with Oscar's nephew, Llefren Velasquez, and his family, in a townhouse in Manassas, Virginia.  Although nine people were residing in a three-bedroom home, both Oscar and Maria have multiple extended family members nearby in

Virginia, Maryland, and North Carolina.  The daughters received immunizations, were enrolled in school, and regularly attend church services.  Until Oscar discovered Maria's involvement with another man, the evidence in the record suggests that this home environment for the daughters was stable.  This stands in stark contrast to the home environment in El Salvador, which was visited in December of 2013 by an armed gang that threatened the life of Maria and her daughters, should they ever return to El Salvador.  Accordingly, this factor also supports a finding of parental intent to settle in the United States.  <u>Maxwell</u>, 588 F.3d at 252.

Ultimately, the objective evidence in the record, when viewed in light of the factors utilized by the Fourth Circuit, establishes by a preponderance of the evidence that Oscar and Maria shared parental intent for the daughters to habitually reside in the United States.  Clearly, Oscar's intent changed when he learned of Maria's involvement with another man.  Indeed this was the triggering event that set this litigation in motion.  However, immediately prior to this date, "the parents shared a settled intention to abandon the former country of residence" and establish their new home in the United States.  <u>Maxwell</u>, 588 F.3d at 251 (citing <u>Mozes</u>, 239 F.3d at 1075) (additional citations omitted).  The evidence in the record shows by a preponderance of the evidence that this is a case

"where the petitioning parent had earlier consented to let the
child[ren] stay abroad for some period of ambiguous duration . .
. [and that] despite the lack of perfect consensus, the court
finds the parents to have shared a settled mutual intent that
the stay last indefinitely." Mozes, 239 F.3d at 1077; see also
Maxwell, 588 F.3d at 251. Accordingly, the first part of the
two-part Mozes framework weighs in favor of concluding the
daughters were habitually resident in the United States
immediately prior to their retention.

### b. Acclimatization by the Children

The second question under the Mozes test is "whether
there was an actual change in geography coupled with the passage
of an appreciable period of time, one sufficient for
acclimatization by the children to the new environment."
Maxwell, 588 F.3d at 251 (quoting Papakosmas v. Papakosmas, 483
F.3d 617, 622 (9th Cir. 2007) (quoting Mozes, 239 F.3d at 1078))
(internal quotation marks omitted). The Court is ultimately
concerned with whether "ordering the child[ren]'s return [to El
Salvador] would now be tantamount to taking the child out of the
family and social environment in which [their] life has
developed." Id. at 253-54 (quoting Mozes, 239 F.3d at 1081)
(internal quotation marks and alterations omitted). Again,
after turning to the objective factors announced in Maxwell, the
Court concludes the daughters have acclimatized to the United

30

States.

First, the daughters are enrolled in Prince William
County Public Schools.  Maxwell, 588 F.3d at 254 (citations
omitted).  To prepare for their attendance, Oscar and Maria took
the daughters to receive the necessary immunizations.  (Resp't
Ex. 10.)  Both daughters seem to be performing well academically
and have good attendance at school.  (Resp't Ex. 11.)   Most
importantly, the daughters have been enrolled in school in the
United States for a longer period of time than their enrollment
in El Salvadorian schools.  Indeed, the youngest daughter was
only eligible to be enrolled in pre-school activities this past
fall at the age of five years old.  And the eldest daughter was
previously enrolled in school in Kentucky around 2011 for a
period of time.  Conversely, the only evidence of the daughters'
schooling in El Salvador is a letter from the school that
acknowledges their enrollment as of April of 2014.  (Pet'r Ex.
1-E.)  There is no evidence in the record about their date of
enrollment.  Thus, the daughters' lengthier period of schooling
in the United States supports the conclusion that the daughters
have acclimatized to the United States.

Second, the daughters participate in social activities
in their community and through school.  Maxwell, 588 F.3d at 254
(citations omitted).  Maria testified that on the weekends, the
daughters attend birthday parties for friends or they spend time

31

with the extended family.  The daughters also attend church
services on a weekly basis.  Thus, the second factor also
supports the conclusion that the daughters have acclimatized to
the United States.

Third, the relative stay of the daughters in the
United States is shorter than the time they have spent in El
Salvador, which counsels against acclimatization.  Maxwell, 588
F.3d at 254 (citations omitted).  But again, the Court finds
this factor is mitigated by the fact that the daughters have
traveled to the United States each year, typically during the
winter months between November and February.  And at the time of
retention, the daughters had been in the United States for
almost four months, which has now been extended to almost a year
and a half by the time of trial.  Nonetheless, the daughters
were born in El Salvador and spent the majority of their time
there, so relatively, this factor weighs against acclimatization
to the United States.

Lastly, both daughters are still very young, which
weighs in favor of their acclimatization to the United States.
Maxwell, 588 F.3d at 254 (citations omitted).  There is no
evidence in the record about the daughters' familial or societal
connections to El Salvador.  Conversely, the daughters traveled
to the United States at least once per year and have now been in
the United States close to one and a half years.  They are both

32

attending school and learning English.  Moreover, Maria and the daughters have extended family in the United States, specifically in Virginia, Maryland, and North Carolina.  Thus, the young age of the daughters suggests that they have not yet acclimatized to El Salvador, but instead have started to acclimatize to the United States.

Ultimately, the Court finds that ordering the daughters return to El Salvador would not be tantamount to returning them home.  See Holder v. Holder, 392 F.3d 1009, 1019 (9th Cir. 2004).  Instead, ordering such a return would be tantamount to ripping the daughters out of a familial and social environment to which they have started to acclimatize, for the reasons discussed above.  See Maxwell, 588 F.3d at 253-54 (quoting Mozes, 239 F.3d at 1081) (internal quotation marks and alterations omitted).  The Court therefore finds that "there was an actual change in geography coupled with the passage of an appreciable period of time, one sufficient for acclimatization by the children to the new environment."  Maxwell, 588 F.3d at 251 (citations omitted).  Accordingly, the second factor also supports the conclusion that the daughters were habitually resident in the United States at the time of retention.

For these reasons, the Court concludes the daughters were habitually resident in the United States as of February 27, 2014, the date of retention.  Thus, under the Hague Convention,

Oscar failed to satisfy his prima facie case by a preponderance of the evidence, and Maria's retention of the daughters in the United States was not wrongful. Oscar did, however, set forth evidence showing Maria's retention of the daughters violated his custodial rights under El Salvadorian law, and that he was exercising those rights at the time of retention.  Thus, Oscar satisfied his prima facie burden as to these two elements.

## B. Affirmative Defense to Wrongful Retention

In the alternative, even if the Court found the daughters were habitually resident in El Salvador at the time of retention, making such retention wrongful under the Hague Convention, the Court would find that there is a grave risk that returning the daughters to El Salvador would expose them to physical or psychological harm, or otherwise place them in an intolerable situation.  See Hague Convention, art. 13b, 19 I.L.M. at 1502; see also 22 U.S.C. § 9003(e)(2)(A). Accordingly, Maria would have an affirmative defense to Oscar's claim of wrongful retention.

> Only evidence directly establishing the existence of a grave risk that would expose the child to physical or emotional harm or otherwise place the child in an intolerable situation is material to the court's determination.  The person opposing the child's return must show that the risk to the child is grave, not merely serious.

Hazbun Escaf v. Rodriquez, 200 F. Supp. 2d 603, 614 (E.D. Va.

2002) (quoting <u>Friedrich v. Friedrich</u>, 78 F.3d 1060, 1068 (6th
Cir. 1996) ("<u>Friedrich II</u>") (citation omitted)).  Federal courts
typically apply this defense if the children's return to one
parent would result in some type of abuse or physical harm.
<u>Hazbun Escaf</u>, 200 F. Supp. 2d at 613 n.35 (citing <u>Miller</u>, 240
F.3d at 402 (finding no evidence that the mother would pose a
danger to her children); <u>Nunez-Escudero v. Tice-Menley</u>, 58 F.3d
374 (8th Cir. 1995) (finding that allegations that the mother
was physically, sexually, and mentally abused by the father and
that the mother feared for the safety of the child were too
general to establish an exception); <u>Blondin v. Dubois</u>, 189 F.3d
240,247 (2d Cir. 1999) (refusing to return a child to France
because she face a grave risk of physical abuse from her father
there)).

Here, the Court finds by clear and convincing evidence
that the daughters face a grave risk of exposure to physical
harm if this Court were to order their return to El Salvador
with Oscar.  Under the facts and circumstances of this
particular case, the Court indeed cannot order their return for
at least three specific and articulable reasons.  First, El
Salvador is one of the most dangerous and violent countries in
the world.  (<u>See</u> Pet'r Exs. 12-16.)  Even though homicides have
decreased in recent years, extortion has not decreased and is
more prevalent than ever.  Second, this violence has

specifically manifested itself in the form of at least two known threats of physical violence to Oscar's wife and daughters.  In the most recent threat of December of 2013, three armed gang members confronted Maria's sister in person, held a machete to her throat, and threatened the life of Maria if she ever returned.  This is a specific threat of violence that represents a grave risk of physical harm to Maria and her daughters should they return to El Salvador.  Stated differently, it is not merely a possibility, but an actual, physical threat.  Third, the Court finds these threats are credible because Oscar's daughter from a previous marriage was kidnapped and held for ransom over multiple days.  This daughter was rescued and brought to safety only after an armed raid by the El Salvadorian military and a $30,000 payment by Oscar.

The Court reaches this conclusion on the affirmative defense fully aware that this provision of the Convention "was not intended to be used by defendants as a vehicle to litigate (or relitigate) the child's best interests." Hazbun Escaf, 200 F. Supp. 2d at 613-14 (quoting Friedrich II, 78 F.3d at 1068). And even though both extortion threats in this case have been reported to the police, there is no evidence in the record that any arrest was made, that either threat was not credible, and that additional threats or kidnap attempts would not happen in the future.  Cf. id. ("[T]here is evidence that [the child's]

36

family and other relatives live safely in [Colombia] and that

[the child], on his return, would be able to resume his habitual

residence, enjoy his friends and family, and return to the

school where he was previously enrolled.").  The Court is simply

not willing to order the return of two minor children to such a

dangerous environment given the grave risk of physical harm they

face in the form of extortion and kidnapping.   Accordingly, the

Court would alternatively find that Maria established the "grave

risk of physical harm" defense by clear and convincing evidence.

### V. Conclusion

For these reasons, the Court will deny and dismiss

Oscar's Verified Complaint and Petition for Return of the

Children.  An appropriate Order shall issue.


<table>
<tr><td></td><td>/s/</td></tr>
</table>

April 8, 2015                    James C. Cacheris
Alexandria, Virginia      UNITED STATES DISTRICT COURT JUDGE